IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RYAN COPERTINO,                           : Civil No. 1:24-CV-1949
                                          :
    Plaintiff,                        :
                                          :
        v.                       :
                                          : (Chief Magistrate Judge Bloom)
FRANK BISIGNANO,                          :
Commissioner of Social Security,[1]       :
                                          :
    Defendant.                        :

## MEMORANDUM OPINION

## I.   Introduction

Ryan Copertino filed an application under Titles II and XVI of the Social Security Act for disability and disability insurance benefits and supplemental security income on February 28, 2022. Following a hearing before an Administrative Law Judge ("ALJ"), the ALJ found that Copertino was not disabled from his alleged onset date of January 1, 2014, through February 5, 2024, the date of the ALJ's decision.

---

[1] Frank Bisignano became the Commissioner of Social Security on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Bisignano is substituted as the defendant in this suit.

Copertino now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. After a review of the record, and mindful of the fact that substantial evidence "means only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'"[2] we conclude that substantial evidence supports the ALJ's findings in this case. Therefore, we will affirm the decision of the Commissioner denying this claim.

## II.    Statement of Facts and of the Case

Ryan Copertino filed for disability and disability insurance benefits, as well as supplemental security income, alleging disability due to anxiety, depression, and bipolar disorder.[3] Copertino was 17 years old at the time of his alleged onset of disability, had at least a high school education, and had no past relevant work.[4]

The medical record regarding Copertino's impairments[5] revealed that in April of 2015, Copertino presented at the Stony Brook University

---

[2] *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

[3] Tr. 55.

[4] Tr. 29.

[5] The record also contains Copertino's school assessments for years prior to his alleged onset of disability. *See* Tr. 327-71. While we have

2

Hospital in New York after calling the police and expressing suicidal ideations.[6] He reported being bullied by his peers at school and presented with a laceration on his neck, which he admitted was due to cutting himself with a kitchen knife.[7] He further reported experiencing depression for the past four to five months, which in part stemmed from questioning his sexuality.[8] However, it was noted that Copertino took advanced placement classes in school, was a member of the track team, and worked 20-25 hours per week at a grocery store.[9]

Two weeks later, Copertino was admitted the hospital after again calling the police and voicing suicidal thoughts.[10] He reported increased depression and anxiety, as well as transient plans to stab himself, to hospital staff.[11]  A psychiatric evaluation at this time noted that Copertino was struggling with his sexual identity, which led him to

---

considered these records, because they predate the alleged disability period by several years, we will forego a discussion of them.

[6] Tr. 428.

[7] *Id.*

[8] Tr. 452.

[9] *Id.*

[10] Tr. 374.

[11] *Id.*

report himself to the police for "harassing" another student whom he could not stop "obsessing" over.[12]  A mental status examination revealed cooperative behavior, coherent thought processes, a depressed mood, impaired insight and judgment, and poor to fair impulse control.[13]

When Copertino started college in October of 2015, he began services with the school's counseling center.[14]  His mental health intake assessment noted that he experienced "obsessions about stupid things," which led to depression and frustration.[15]  A mental status examination revealed cooperative but tense behavior, an anxious mood and restricted affect, logical thought processes, normal speech, and moderately impaired judgment.[16]  It was recommended that Copertino undergo a psychiatric evaluation and individual counseling.[17]  The psychiatric evaluation revealed that Copertino experienced depressive symptoms including sleep, decreased concentration, and anger issues.[18]  Copertino

---

[12] Tr. 388.
[13] Tr. 390.
[14] Tr. 500.
[15] *Id.*
[16] Tr. 502.
[17] Tr. 503.
[18] Tr. 504-05.

was diagnosed with autism spectrum disorder, anxiety, and impulsiveness, and he was prescribed medication.[19]

At an initial counseling session in October of 2015, Copertino's counselor noted his history of obsessive thoughts that interfered with his academic work.[20]  Copertino reported having several friends and no conflicts with his peers.[21]  On examination, his mood was "OK" and he was mildly restless, and he exhibited limited insight and judgment.[22] Treatment notes from November indicate that Copertino was admitted to a psychiatric unit for assessment due to his suicidal ideations, past history of violence, drawings left in his residence hall, and inability to cope with stressors.[23]  At a follow up visit, Copertino minimized the reason for his hospital visit but agreed that he needed to continue taking his medication.[24]  In December, prior to Copertino returning home for

---

[19] Tr. 506.
[20] Tr. 507.
[21] *Id.*
[22] Tr. 508.
[23] Tr. 509.
[24] Tr. 511.

break, his roommate joined his counseling session and reported concern for Copertino's behavior.[25]

In April of 2016, Copertino reported a recently depressed mood and suicidal ideation with a plan to jump off a bridge.[26]  While he did not follow through with his plan, he jumped off a 15-foot ledge on campus at the encouragement of his peers for attention.[27]  He also reported at this session that he was engaging in relationships online with individuals who asked him to send "inappropriate pictures."[28]  A mental status examination revealed cooperative behavior, a depressed mood, logical thought processes, and ruminations about feeling abandoned.[29]  At his next visit, he reported having gone to the bridge again after being bullied by his peers who found out about his online relationships.[30]

Copertino continued therapy over the summer with a provider close to his home, Dr. Siddiqi, at which time he reported he stopped his

---

[25] Tr. 516.
[26] Tr. 513.
[27] *Id.*
[28] *Id.*
[29] Tr. 514.
[30] Tr. 520.

medication due to researching the possible side effects.[31]  His mother reported he was easy to anger and "more explosive" since stopping his medications.[32]  Dr. Siddiqi started him on Wellbutrin.[33]  At his next visit, Copertino reported feeling significantly better on the Wellbutrin, and that he was working at Burger King.[34]  A mental status examination revealed a cooperative attitude, appropriate mood, good attention, intact thought processes, and good impulse control.[35]

Copertino resumed counseling at college in September of 2016, at which time he reported working almost full time at Burger King over the summer and purchasing himself a car.[36]  He told his counselor that he was living on campus with five other roommates, and that he continued to engage in online relationships.[37]  In November, Copertino reported improvement in his mood and severity of symptoms since starting a new

---

[31] Tr. 498.

[32] *Id.*

[33] Tr. 499.

[34] Tr. 496.

[35] *Id.*

[36] Tr. 527.

[37] *Id.*

medication.[38]  His examination revealed an anxious mood, restricted affect, and mildly impaired judgment.[39]  However, in January, Copertino reported more ruminating thoughts, particularly about an incident in which his family dog bit him while he was home.[40]  He also reported to his counselor that he planned a trip to meet up with a man he met online.[41]  Copertino's end-of-semester treatment notes indicated that he was returning home for the summer after experiencing episodes of increased depression and ruminating thoughts regarding his family dog, his grandfather becoming ill, and living at home over the summer.[42]

Copertino returned to treatment with Dr. Siddiqi over the summer, at which time he had an unremarkable mental status evaluation.[43]  Dr. Siddiqi noted that Copertino had good control of his anxiety with his medications.[44]  But in June, Dr. Siddiqi's notes indicated Copertino

---

[38] Tr. 531.

[39] Id.

[40] Tr. 533.

[41] Id.

[42] Tr. 536-37.

[43] Tr. 494.

[44] Id.

stopped taking his medications.[45]  Copertino reported in July that he was moving to Pennsylvania with his parents and was consistently taking his medications, which made him feel significantly better.[46]  A mental status examination at this visit was unremarkable.[47]

In September of 2017, Copertino presented to the counseling center after a man he had been dating showed up unexpectedly on campus.[48] Copertino further reported "controlling" behavior by this individual.[49]  A mental status examination at this time revealed an anxious mood and mildly impaired judgment but was otherwise unremarkable.[50]   A discharge summary from June of 2018 noted that Copertino's treatment goals were partially met, and that he was going to his parents' house in Pennsylvania for the summer.[51]  Copertino continued counseling in his senior year, and treatment notes indicate he worked part time for Uber.[52]

---

[45] Tr. 492.
[46] Tr. 490.
[47] *Id.*
[48] Tr. 602.
[49] *Id.*
[50] Tr. 603.
[51] Tr. 669-70.
[52] Tr. 677.

The counseling discharge summary further noted that Copertino planned to live in an apartment in Pennsylvania near his parents after graduation.[53]

Copertino's next documented visit for his mental health impairments was in January of 2022 with Dr. John Harkless.[54] Copertino reported panic attacks and increasing difficulties.[55] He began counseling with Oasis Lifecare in April of 2022.[56] Copertino complained of panic attacks, mood swings, obsessive thoughts, and difficulty sleeping.[57] He also reported having been arrested for reckless driving in 2021.[58] A mental status examination revealed an anxious affect, fair eye contact, compulsions and obsessions, fair insight and judgment, and intact attention and concentration.[59] Copertino was diagnosed with obsessive compulsive disorder and started on medications.[60] At a follow

---

[53] *Id.*
[54] Tr. 722.
[55] *Id.*
[56] Tr. 734.
[57] *Id.*
[58] Tr. 735.
[59] Tr. 736-37.
[60] Tr. 737.

up appointment in July, he reported daily anxiety and depression and panic attacks two times per week.[61]  He also reported hitting himself when he was stressed or sad.[62]  Other than "fair" insight, judgement, and impulse control, Copertino's mental status examination was unremarkable.[63]

Copertino underwent a mental status evaluation with Dr. Angela Chiodo in August of 2022.[64]  Dr. Chiodo noted Copertino's history of hospitalizations and outpatient treatment, as well as his completion of his college degree and his part-time employment as a banquet server.[65] Copertino reported experiencing crying spells, obsessive thoughts, paranoia, and impulsive behavior.[66]  On examination, Copertino was slightly anxious but had appropriate eye contact, coherent thought processes, intact attention, concentration, and memory skills, and fair insight and judgment.[67]  Copertino reported an ability to perform self-

---

[61] Tr. 731.
[62] *Id.*
[63] Tr. 732.
[64] Tr. 745-49.
[65] Tr. 745.
[66] Tr. 746.
[67] Tr. 747.

care, household chores, socialize with family, and work four days per week.[68]  In a medical source statement, Dr. Chiodo opined that Copertino had mild limitations in interacting with others.[69]

Copertino continued to treat at Oasis for counseling, and in September of 2022, he reported being fired from his hotel job for being in the restroom obsessively checking the market on his phone.[70]  In November, Copertino's medications were increased, as he was still experiencing anxiety and anxious thoughts, but these symptoms improved at a December visit.[71]  Mental status examinations from this time note an anxious and depressed mood, fair insight and judgement, obsessive thought tendencies, good eye contact, normal attention and concentration, and intact memory skills.[72]

Treatment notes from January through July of 2023 indicate that Copertino continued to suffer from some symptoms of anxiety and depression, such as changes in mood and obsessive or ruminating

---

[68] Tr. 748.
[69] Tr. 750-51.
[70] Tr. 827.
[71] Tr. 818-22.
[72] Tr. 819, 822.

thoughts.[73]  During this time, he was working part time with DoorDash, which he reported caused him less anxiety because he had no boss.[74]  He was also living on his own in an apartment.[75]  Mental status examinations during this time showed an improvement in Copertino's mood, insight, judgment, and anxiety.[76]

It is against the backdrop of this record that an ALJ held a hearing on Copertino's disability application on November 30, 2023.[77]  Copertino and a Vocational Expert both appeared and testified at this hearing.[78]  Following this hearing, on February 5, 2024, the ALJ issued a decision denying Copertino's application for disability benefits.[79]  The ALJ first concluded that Copertino had not engaged in substantial gainful activity since his alleged onset date of January 1, 2014.[80]  At Step 2 of the sequential analysis that governs disability claims, the ALJ found that

---

[73] Tr. 867-85.
[74] Tr. 870, 879, 885.
[75] Tr. 882, 885.
[76] Tr. 867-85.
[77] Tr. 36-53.
[78] *Id.*
[79] Tr. 14-35.
[80] Tr. 19-20.

Copertino suffered from severe impairments of bipolar disorder, anxiety disorder, depressive disorder, and obsessive compulsive disorder.[81]  At Step 3, the ALJ concluded that none of these impairments met or equaled the severity of a listed impairment under the Commissioner's regulations.[82]  Specifically, the ALJ found that Copertino experienced, at most, mild to moderate limitations in the four broad areas of mental functioning.[83]

Between Steps 3 and 4, the ALJ then concluded that Copertino:

[H]a[d] the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant requires a work environment with no greater than a moderate noise level. The claimant cannot perform occupational driving. The claimant can tolerate occasional interactions with supervisors. The claimant can tolerate occasional interactions with coworkers, but no work on mandated teams. The claimant can tolerate incidental interactions with the public, such as those which would occur when passing someone in a hallway or sharing an elevator, but the claimant cannot have direct customer service-related positions. The claimant can carry out simple instructions. The claimant cannot perform fast-paced assembly line type of work or hourly quota work, but can sustain a flexible and goal oriented pace. The claimant requires a low stress work environment, defined as only

---

[81] Tr. 20.
[82] Tr. 20-22.
[83] Tr. 21-22.

occasional decision-making and occasional changes in a routine work setting, where changes are introduced gradually. In addition to customary breaks, the claimant would be off task 5-10% of the workday on a regular basis.[84]

In reaching this RFC determination, the ALJ considered the objective medical record detailed above, the medical opinion evidence, and Copertino's reported symptoms. With respect to the medical opinion evidence, the ALJ considered the opinions of state agency consultants Dr. Kennedy and Dr. Urbanowicz.[85] Dr. Kennedy found that Copertino had moderate limitations in his ability to maintain concentration, persistence, and pace, and manage himself, and a marked limitation in interacting with others.[86] She further opined that Copertino could follow simple instructions (*i.e.*, perform one and two step tasks), and that he can perform simple, routine, repetitive tasks in a stable environment.[87] The ALJ found this opinion only partially persuasive.[88] Specifically, the ALJ reasoned that Dr. Kennedy's marked limitation in interacting with

---

[84] Tr. 22.
[85] Tr. 27-28.
[86] Tr. 58.
[87] Tr. 61.
[88] Tr. 27-28.

15

others was internally inconsistent with her later conclusion that Copertino could appropriately interact with coworkers, supervisors, and the general public.[89]   The ALJ further found that Dr. Kennedy's limitations to simple, routine, repetitive tasks was inconsistent with her findings that Copertino had no memory limitations.[90]

The ALJ found Dr. Urbanowicz's opinion to be of limited persuasive value.[91]   Dr. Urbanowicz found that Copertino experienced mild to moderate limitations in the areas of social functioning, and that he was "able to meet basic mental demands on a sustained basis[.]"[92]  The ALJ explained that Dr. Urbanowicz "offered no support for how, precisely, the claimant was able to meet basic mental demands for work activity despite his impairments."[93]   Further, although Dr. Urbanowicz relied partially on Dr. Kennedy's assessment, she failed to explain what parts of Dr. Kennedy's opinion were consistent with her own findings.[94]

---

[89] Tr. 27.

[90] *Id.*

[91] Tr. 28.

[92] Tr. 79, 82.

[93] Tr. 28.

[94] *Id.*

The ALJ also considered the opinion of the independent consultative examiner, Dr. Chiodo, and found her opinion to be of limited persuasive value.[95] While the ALJ noted that Dr. Chiodo's findings were supported by her one-time examination, the ALJ further noted that the longitudinal objective evidence showed more significant functioning limitations that "are highly inconsistent with Dr. Chiod[o]'s opinion that the claimant experienced no limitation in memory, concentration, or adaptive functioning."[96]

With respect to Copertino's symptoms, the ALJ found that Copertino's statements concerning the intensity, persistence, and limiting effects of his impairments were not entirely consistent with the medical evidence.[97] Copertino testified that at the time of the hearing, he was 27 years old, lived alone in an apartment, and had completed his bachelor's degree.[98] He was also working part-time with DoorDash two-to-three days per week.[99] Copertino testified that his compulsive

---

[95] Tr. 28-29.
[96] Tr. 29.
[97] Tr. 30.
[98] Tr. 42.
[99] Tr. 43.

17

thoughts distract him, which prevented him from working full-time.[100]
He further reported experiencing panic attacks, sensitivity to noise,
difficulty focusing, and crying spells.[101]  Copertino completed his college
degree, during which time he lived on campus with others.[102]  He testified
that he could complete most household chores without assistance.[103]

The ALJ ultimately found Copertino's testimony to be inconsistent
with the objective clinical findings.[104]  The ALJ recounted the objective
evidence during the alleged disability period, including unremarkable
examination findings of adequate attention and concentration, normal
insight and judgment, coherent thought processes, and normal memory
activity.[105]  The ALJ also noted evidence that Copertino was able to
interact with others in various settings, complete a college degree, and
work various part-time jobs during the relevant period.[106]  Ultimately,
the ALJ concluded that Copertino was not as limited as he alleged.

---

[100] Tr. 45.
[101] Tr. 45, 48-49.
[102] Tr. 42, 46.
[103] Tr. 47-48.
[104] Tr. 24.
[105] Tr. 24.
[106] Tr. 24-27.

Having made these findings, the ALJ found at Step 4 that Copertino had no relevant past work but found at Step 5 that he could perform the occupations of a night cleaner, dishwasher, and laundry worker.[107]  Accordingly, the ALJ found that Copertino had not met the stringent standard prescribed for disability benefits and denied his claim.[108]

This appeal followed.  On appeal, Copertino argues that the ALJ's RFC limitations, as well as his consideration of the medical opinions and Copertino's subjective symptoms, is not supported by substantial evidence.  This case is fully briefed and is therefore ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.  <u>Discussion</u>

### A. <u>Substantial Evidence Review – the Role of this Court</u>

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-

---

[107] Tr. 30.

[108] *Id.*

maker are supported by substantial evidence in the record.[109]

Substantial evidence "does not mean a large or considerable amount of

evidence, but rather such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."[110]    Substantial evidence

means less than a preponderance of the evidence but more than a mere

scintilla.[111]

A single piece of evidence is not substantial evidence if the ALJ

"ignores, or fails to resolve, a conflict created by countervailing

evidence."[112]  However, where there has been an adequately developed

factual record, substantial evidence may be "something less than the

weight of the evidence, and the possibility of drawing two inconsistent

conclusions from the evidence does not prevent [the ALJ's decision] from

being supported by substantial evidence."[113]  The court must "scrutinize

---

[109] *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).

[110] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

[111] *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

[112] *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted).

[113] *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

the record as a whole" to determine if the decision is supported by substantial evidence.[114]

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[115]   Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations."[116]   Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law.[117]

---

[114] *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

[115] *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[116] *Id.*

[117] *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder."[118] Thus, we cannot re-weigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision.[119] This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements.[120] Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests."[121]

## B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

---

plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

[118] *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)).

[119] *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000).

[120] *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted).

[121] *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."[122]  This requires a claimant to show a severe physical or mental impairment that precludes him or her from engaging in previous work or "any other substantial gainful work which exists in the national economy."[123]   To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured.[124]

In making this determination, the ALJ follows a five-step evaluation.[125]   The ALJ must sequentially determine whether the

---

[122] 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a).

[123] 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a).

[124] 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

[125] 20 C.F.R. §§404.1520(a), 416.920(a).

23

claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").[126]

Between Steps 3 and 4, the ALJ must also determine the claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."[127]  In making this assessment, the ALJ must consider all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.[128]  Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence.[129]

---

[126] 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

[127] *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1).

[128] 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

[129] *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him or her from engaging in any past relevant work.[130]  If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and work experience.[131]

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination.  While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC."[132]  Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an

---

[130] *Mason*, 994 F.2d at 1064.

[131] 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

[132] *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006); *see also Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013).

ALJ must always base his RFC on a medical opinion from a physician is misguided."[133]

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision. Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence.[134] These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination. On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence.[135]    Ultimately, it is our task to

---

[133] *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).
[134] *Biller*, 962 F. Supp. 2d at 778–79.
[135] *See Titterington*, 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15.

26

determine, considering the entire record, whether the RFC determination is supported by substantial evidence.[136]

### C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

For applications filed after March of 2017, the regulations require ALJs to consider several factors to determine the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion.[137]  Supportability and consistency are the two most important factors, and an ALJ must explain how these factors were considered in his or her written decision.[138]  Supportability means "[t]he more relevant the objective medical evidence and supporting explanations . . . are to support his or her medical opinion(s) . . . . the more persuasive the medical opinions . . . will be."[139]  The consistency

---

[136] *Burns,* 312 F.3d 113.

[137] 20 C.F.R. § 404.1520c(c).

[138] 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022).

[139] 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

factor focuses on how consistent the opinion is "with the evidence from other medical sources and nonmedical sources."[140]

While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations."[141]  When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason."[142]  Further, the ALJ can credit parts of an opinion without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated.[143]    On the other hand, in cases where no medical opinion credibly supports the claimant's allegations, "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided."[144]

---

[140] 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

[141] *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).

[142] *Mason*, 994 F.2d at 1066.

[143] *See Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016).

[144] *Cummings*, 129 F. Supp. 3d at 214–15.

**D. Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms**

When evaluating lay testimony regarding a claimant's reported degree of pain and disability, the ALJ must make credibility determinations.[145] Our review of those determinations is deferential.[146] However, it is incumbent upon the ALJ to "specifically identify and explain what evidence he found not credible and why he found it not credible."[147] An ALJ should give great weight to a claimant's testimony "only when it is supported by competent medical evidence."[148] As the Third Circuit has noted, while "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them."[149]

---

[145] *See Diaz v. Comm'r,* 577 F.3d 500, 506 (3d Cir. 2009).

[146] *Id.*

[147] *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014) (citations omitted).

[148] *McKean v. Colvin*, 150 F. Supp. 3d 406, 415–16 (M.D. Pa. 2015) (citations omitted).

[149] *Chandler v. Comm'r of Soc. Sec.,* 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled").

The Social Security Rulings and Regulations provide a framework for evaluating the severity of a claimant's reported symptoms.[150]  Thus, the ALJ must follow a two-step process: first, the ALJ must determine whether a medically determinable impairment could cause the symptoms alleged; and second, the ALJ must evaluate the alleged symptoms considering the entire administrative record.[151]

Symptoms such as pain or fatigue will be considered to affect a claimant's ability to perform work activities only if medical signs or laboratory findings establish the presence of a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.[152]  During the second step of this assessment, the ALJ must determine whether the claimant's statements regarding the intensity, persistence, or limiting effects of his or her symptoms are substantiated considering the entire case record.[153]  This includes, but is not limited to, medical signs and laboratory findings; diagnoses; medical opinions

[150] 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p.
[151] SSR 16-3p.
[152] 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p.
[153] 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p.

provided by treating or examining sources and other medical sources; and information regarding the claimant's symptoms and how they affect his or her ability to work.[154]

The Social Security Administration recognizes that individuals may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings.[155]  Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations set forth seven factors that may be relevant to the assessment of the claimant's alleged symptoms.[156] These factors include: the claimant's daily activities; the "location, duration, frequency, and intensity" of the claimant's pain or symptoms; the type, dosage, and effectiveness of medications; treatment other than medications; and other factors regarding the claimant's functional limitations.[157]

---

[154] *Id.*
[155] SSR 16-3p.
[156] 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).
[157] *Id.*

E. <u>The ALJ's Decision is Supported by Substantial Evidence.</u>

Our review of the ALJ's decision denying an application for benefits is significantly deferential. Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is "only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[158] Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

Copertino first argues that the ALJ erred in failing to include Dr. Kennedy's limitation to one-to-two-step tasks in the RFC.[159] He asserts that the failure to include this limitation or explain its absence requires a remand.[160] While the ALJ found Dr. Kennedy's opinion only partially persuasive, the ALJ did include a limitation to simple instructions in the RFC, although did not use the precise words "one-to-two-step tasks."[161] Accordingly, the plaintiff's argument that the ALJ failed to address this

---

[158] *Biestek*, 139 S. Ct. at 1154.
[159] Doc. 14 at 6.
[160] *Id.*
[161] Tr. 22, 27.

limitation is belied by the RFC that actually included the limitation to simple instructions.

The plaintiff also contends that such a limitation is inconsistent with the jobs identified by the Vocational Expert because two of the three jobs require a reasoning level of 2, and a limitation to simple instructions conflicts with reasoning level 2 jobs.[162]  It is true that two of the jobs identified by the Vocational Expert—dishwasher and laundry worker—require reasoning level 2.[163]  However, a limitation to one- or two-step tasks can (but does not always) preclude jobs requiring reasoning level two, as such jobs require that an individual be able to carry out "detailed but uninvolved written or oral instructions."[164]  Moreover, the third job

---

[162] Doc. 14 at 8-9.

[163] *See* Dishwasher, DOT 318.687-010, 1991 WL 672755; Laundry Worker, DOT 302.685-010, 1991 WL 672657.

[164] See *Cowher v. O'Malley*, 2024 WL 3161865, at *9-10 (W.D. Pa. June 24, 2024); *see also Leach v. Kijakazi*, 70 F.4th 1251, 1257 (9th Cir. 2023) ("A level-two job with 'detailed but uninvolved . . . instructions' could require an employee to follow lengthy simple instructions. On the present record, then, we cannot determine whether the level-two jobs identified by the vocational expert require only short, simple instructions."); *Thomas v. Berryhill*, 916 F.3d 307, 314 (4th Cir. 2019) ("We believe that Thomas, being limited to short, simple instructions, may not be able to carry out detailed but uninvolved instructions.").

identified by the Vocational Expert—night cleaner—requires reasoning level 1, which would comport with a simple instructions limitation.[165]

Accordingly, in our view, given that the ALJ identified a reasoning level 1 job that Copertino could perform, any error in the ALJ's RFC analysis regarding simple instructions limitation, as well as the identification of reasoning level 2 jobs, is harmless. Social Security appeals are subject to harmless error analysis.[166] Under the harmless error analysis, a remand is warranted only if the error "prejudices a party's 'substantial rights' "; that is, if the error "likely affects the outcome of the proceeding [.]"[167] The claimant bears the burden of proving an error is harmful.[168] Here, Copertino asserts that the night cleaner job is inconsistent with the ALJ's limitation to only incidental interaction with the public.[169] But at the hearing, the Vocational Expert identified this job as one that someone with the plaintiff's limitations—

---

[165] *See* Cleaner, Housekeeping, DOT 323.687-014, 1991 WL 672783.
[166] See *Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016).
[167] *Hyer v. Colvin*, 72 F. Supp. 3d 479, 494 (D. Del. 2014).
[168] *Id.*
[169] Doc. 14 at 9.

including only incidental interaction with the public—could perform.[170]
Indeed, "[the Commissioner can [] rely on testimony from a VE to meet
its step-five evidentiary burden."[171]  And the plaintiff's counsel did not
object to the qualifications of the vocational expert at the administrative
hearing.  Thus, the plaintiff's belated contention that the night cleaner
job appears to conflict with the RFC's limitations is unavailing, fails to
show a harmful error in the RFC determination, and does not require a
remand.

Copertino also contends that the ALJ erred in assessing his
subjective testimony, in that the ALJ appeared to rely on objective
findings of "no acute distress," the scarcity of records related to
Copertino's mental health, findings that Copertino was "stable," and
factors such as Copertino's ability to obtain a college degree.[172]  First, as
to the plaintiff's contention that the ALJ erred by remarking that there
was "minimal objective evidence" of Copertino's impairments, this

---

[170] Tr. 51.
[171] *Zirnsak v. Colvin*, 777 F.3d 607, 616 (3d Cir. 2014) (citing 20 C.F.R. §
404.1566(e)).
[172] Doc 14 at 13-17.

contention is simply incorrect. While the ALJ did remark that there was minimal objective evidence "pertaining to the claimant's medical status during 2019, 2020, and 2021[,]" the ALJ thoroughly recounted and examined all of the mental health evidence contained in the record from the alleged onset date through 2023.[173] Moreover, the ALJ was entitled to consider objective findings in the record and did not solely rely on findings of "no acute distress" or that Copertino's impairments were "stable." The ALJ's decision consistently noted findings of impaired insight and judgment and varying moods throughout the alleged disability period, but contrasted these findings with others such as logical thought processes, normal speech activity, cooperative behavior, intact attention and concentration, and intact memory skills, among others.[174] Thus, the contention that the ALJ solely relied on findings of "no acute distress" and stability is plainly contradicted by the ALJ's decision.

Further, the ALJ was entitled to consider evidence showing that the plaintiff was able to obtain a college degree and work various part

---

[173] Tr. 24-29.
[174] *Id.*

time jobs during the relevant period. Contrary to the plaintiff's arguments, the ALJ considered Copertino's testimony that he struggled with his coursework at school but ultimately concluded that there was evidence in the record to contradict Copertino's allegations of disabling impairments. Thus, while Copertino challenges the ALJ's credibility determination, we are not permitted at this stage to reweigh the evidence, and instead must simply determine whether the ALJ's decision was supported by "substantial evidence."[175] Here, we conclude that the ALJ's consideration of Copertino's subjective symptoms is supported by substantial evidence.

Given that the ALJ considered all the evidence and adequately explained the decision for including or discounting certain limitations as established by the evidence, we find no error with the decision. Therefore, under the deferential standard of review that applies to appeals of Social Security disability determinations, we conclude that substantial evidence supported the ALJ's evaluation of this case, and this decision will be affirmed.

---

[175] *Chandler*, 667 F.3d at 359; *Biestek*, 139 S. Ct. at 1154.

IV.  <u>Conclusion</u>

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

Submitted this 17th day of February 2026.


<u>*s/ Daryl F. Bloom*</u>
Daryl F. Bloom
Chief United States Magistrate Judge